FILED
Aug 21 2026
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY s/ DDE DEPUTY

**Adam J. Fitch, Plaintiff, Pro Se**
364 Shady Glen Dr.
Fallbrook, CA 92028
Telephone: 760-675-2999
Email: local12cat86@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Adam J. Fitch**<br>Plaintiff,<br>v.<br>**Operating Engineers Local Union No. 3 Federal Credit Union, known as OE Federal Credit Union**<br>Defendant. | Case No.: '26CV4790 BJC DEB<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY, AND EQUITABLE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Adam J. Fitch, appearing pro se, alleges against Defendant Operating Engineers Local Union No. 3 Federal Credit Union, known as OE Federal Credit Union, as follows:

## I. NATURE OF THE ACTION

1. This is an individual consumer action under the Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693-1693r, and its implementing Regulation E, 12 C.F.R. part 1005. Plaintiff seeks relief for Defendant's alleged failures in investigating and resolving electronic-fund-transfer errors, giving required written notices, supporting the debiting of provisional credit, determining consumer liability for disputed unauthorized electronic activity, and establishing the validity of the disputed balance later used to justify account closure and a claimed offset or transfer.

2. This complaint is filed protectively because EFTA provides that an action must be brought within one year of the occurrence of a violation. 15 U.S.C. §

1693m(g). Plaintiff does not waive any contractual objection, any challenge to the formation or scope of an arbitration provision, or any right to pursue contractually required pre-arbitration resolution.

3. Plaintiff seeks only individual relief. He does not assert a class, representative, or private-attorney-general claim.

## II. PARTIES

4. Plaintiff Adam J. Fitch is a natural person and consumer residing in Fallbrook, San Diego County, California. At all relevant times he maintained consumer deposit accounts with Defendant and used those accounts primarily for personal, family, or household purposes.

5. Defendant Operating Engineers Local Union No. 3 Federal Credit Union is a federally chartered credit union headquartered at 250 North Canyons Parkway, Livermore, California 94551. Defendant uses the name "OE Federal Credit Union," offered and administered Plaintiff's deposit accounts and electronic-fund-transfer services, and is referred to below as "Defendant" or "OE Federal."

## III. JURISDICTION AND VENUE

6. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1693m(g).

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any related California-law claim arising from the same transactions and account administration.

8. Venue is proper principally under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in San Diego County, where Plaintiff accessed the accounts, received or failed to receive account communications, reported the disputes and compromise concerns, and experienced the debits and account consequences at issue. Venue is also proper under 28 U.S.C. §§ 1391(b)(1), (c)(2), and (d) because Defendant purposefully maintained and administered the consumer-account relationship with Plaintiff in this District and is subject to personal jurisdiction here with respect to this action.

9. An actual and ongoing controversy exists concerning the legal effect of Defendant's December 4 closure notice, the status of Plaintiff's checking, savings, and membership relationship, the validity of the claimed debt and later account entries, and the parties' respective rights and obligations. Subject-matter jurisdiction rests on the statutes identified above; 28 U.S.C. §§ 2201-2202 provide a remedy, not an independent basis for jurisdiction.

## IV. FACTUAL ALLEGATIONS

10. On July 22, 2025, Plaintiff attempted to withdraw $504.95 at an ATM. The transaction posted to his account, but Plaintiff reports that the ATM dispensed no cash and provided no receipt.

11. Plaintiff notified Defendant of the asserted error and initiated a dispute on or about July 23, 2025.

12. Defendant provisionally credited the disputed amount on or about July 28, 2025.

13. On or about August 21, 2025, Defendant removed or debited the provisional credit. Defendant later produced a document dated August 21, 2025 titled "Notice of Final Determination," stating that the claim was denied because the ATM balanced.

14. Plaintiff alleges from personal knowledge that he never received an August 21, 2025 letter or written determination at or near that time by mail, email, secure portal, or any other delivery channel available to him. He learned only later that Defendant claimed an August 21 document was its written final determination.

15. The August 21 document does not state, on its face, the date on which the provisional credit would be or was debited and does not state the five-business-day protection for qualifying checks, drafts, similar instruments, and preauthorized transfers described in 12 C.F.R. § 1005.11(d)(2).

16. Defendant has not provided Plaintiff with contemporaneous proof establishing whether, when, or how the August 21 document was created, approved, mailed, emailed, uploaded, transmitted, or otherwise made available to him. Later production of a dated document does not itself establish timely transmission or delivery.

17. During a member-preserved telephone call identified in Plaintiff's recording and transcript as occurring on March 16, 2026, Plaintiff told an OE Federal

representative identified as Becca that he had never been given a written determination and repeatedly reviewed the Regulation E chronology with her. Plaintiff specifically asked whether Defendant was treating the August 26 emails that supplied ATM logs as its written Regulation E determination. Plaintiff alleges from personal knowledge that Becca answered affirmatively. The available transcript also records Becca stating in substance that the letters and ATM logs sent at that time were "the final outcome" of the dispute.

18. Defendant's June 10, 2026 response instead described contact attempts on March 17 and 18 and a later conversation. That date discrepancy is not resolved by the materials produced and can be tested against the original recording, telephone metadata, call logs, and Defendant's records. The substance alleged here is drawn from Plaintiff's preserved recording, transcript, and personal recollection.

19. Despite repeated discussion of the chronology and multiple opportunities to do so, Becca did not identify a separate determination as having been transmitted on August 21, did not identify an August 21 delivery method, and did not reconcile the later September provisional credit and continued escalation with a supposedly completed August 21 determination. Her description of the August 26 materials as the final outcome conflicts with Defendant's later reliance on a separately dated August 21 document and places the document's creation, approval, version history, transmission, and delivery squarely in dispute.

20. Defendant controls the native records needed to determine when the purported August 21 determination was created, approved, transmitted, and made available to Plaintiff, including the relevant call, CRM, document-generation, mailing, email, portal, and notification records.

21. On or about September 8, 2025, Plaintiff timely escalated or reasserted the ATM error and requested further review. That escalation occurred within 60 days of the statement reflecting the challenged transaction and before Defendant restored or renewed provisional credit.

22. On or about August 24-25, 2025, Plaintiff gave Defendant written notice of suspected fraud or compromise, requested that his accounts be closed or protected, and requested a new account number. The notice followed the first provisional-credit debit and informed Defendant that unauthorized activity had occurred or might occur.

23. On August 25, 2025, Defendant stated that it could not close the account while the negative balance or underlying dispute remained unresolved. Defendant therefore knew of the compromise concern while retaining operational control over the account and the means of access.

24. Defendant later stated that it closed Plaintiff's then-existing debit card in response to the August notice. Defendant has not identified what fraud or security case, credential change, account-number change, ACH or external-linking restriction, hold, or monitoring measure, if any, was implemented. Those facts and records are within Defendant's possession and control.

25. Defendant restored or renewed provisional credit on or about September 17, 2025, reflecting that the dispute remained under review or was reopened after August 21.

26. Defendant again debited the disputed amount on or about October 20, 2025. The debit created or materially contributed to a negative checking-account balance and immediate downstream consequences.

27. Plaintiff alleges that Defendant did not notify him, orally or in writing, of the five-business-day protection required by 12 C.F.R. § 1005.11(d)(2) in connection with the October 20 debit. Defendant later asserted that an employee telephoned Plaintiff on October 20 and advised him of the date and amount of the debit. Even accepting that assertion for pleading purposes, Defendant has not asserted or shown that the call included the required five-business-day protection.

28. On November 14, 2025, Defendant warned that Plaintiff's account would be closed and potentially reported to ChexSystems if the balance was not resolved.

29. On December 4, 2025, Defendant issued a written Account Closure Notification stating that the account had been closed, had been reported to ChexSystems, and that items presented for payment would be returned as "Account Closed."

30. During the recorded March 16, 2026 call, Plaintiff asked whether the account had been closed on December 4 and later reopened. Becca stated that she did

not have documentation or notations showing the closure Plaintiff described, asked Plaintiff to provide the closure letter, and then stated that Defendant's system "still shows you have an account with us, but it's not closed." She promised to research the records and follow up. Plaintiff alleges that Defendant did not provide the promised follow-up.

31. Defendant's June 10, 2026 response stated that the December 4 notice concerned checking only, that the notice was automatically generated at the end of the business day, and that staff reviewed the relationship on December 5 and chose not to close checking after applying savings funds to the negative balance. That later explanation conflicts with the notice's unqualified statement that the account "has been closed" and with Becca's inability to locate the closure documentation. "Checking," "savings," "membership," the overall account relationship, debit-card access, online-banking access, and external-linking capability are distinct statuses and cannot be substituted for one another without explanation.

32. For months, Plaintiff repeatedly requested a precise written answer identifying whether each component was closed, open, reopened, restricted, suspended, internally active, or conditionally accessible, together with the effective date and time of each status. Defendant did not provide a complete written reconciliation and instead repeatedly directed Plaintiff to call its office.

33. Defendant's June 10 narrative finally selected one account-status explanation: the closure notice was automatically generated, checking was not actually

closed, staff manually intervened the next business day, and no new ChexSystems report was made. Defendant has not produced the native status codes, timestamps, report, initiating employee or automated process, approval record, or contemporaneous member notice needed to verify that explanation and reconcile it with the December 4 notice and Becca's statements.

34. On December 5, 2025, deposits and account activity nevertheless continued. Available account images show a $509.82 withdrawal transfer from savings share 0001 to checking share 0021 and a matching $509.82 checking deposit after the closure representation.

35. The agreement produced by Defendant in 2026 contains distinct provisions that Defendant may attempt to invoke: a linked-account overdraft transfer under Section 14; a pledge, right of offset, or statutory lien under Section 21; and post-termination reimbursement language under Section 29. Those mechanisms have different factual predicates and are not interchangeable.

36. In its June 10, 2026 response, Defendant classified the $509.82 movement as an institution-initiated exercise of a right of offset after staff reviewed an ACH deposit to savings. That later explanation narrows the dispute but does not identify the native transaction type, initiating employee, approval, exact timestamp, or contemporaneous calculation establishing the validity and amount of the underlying obligation. Plaintiff did not initiate, approve, or authorize a member-directed savings-to-checking transfer for $509.82.

37. The produced agreement separately describes a contractual right of offset and a statutory lien. To the extent Defendant relies on the statutory lien, 12 C.F.R. § 701.39(d) permits enforcement only when the member fails to satisfy an outstanding financial obligation that is due and payable. If Defendant relies solely on contractual offset, Section 21 still applies only to an obligation "owed" to Defendant. The alleged obligation arose from the disputed provisional-credit reversal, and Plaintiff disputes its validity and amount.

38. From December 6 through December 16, 2025, fraud or security alerts continued after the closure representation. On or about December 7, 2025, an alert stated that a process had begun to add a new external account.

39. Plaintiff does not allege that an external-account-linking alert, standing alone, is an electronic fund transfer. He alleges that the alert is evidence that access or linking functionality remained enabled or was invoked after the August compromise notice and December closure representation and that it bears on the authorization and investigation of separately disputed transfers.

40. Plaintiff did not initiate or authorize a member-directed $509.82 transfer. Defendant's stated classification of that movement as an institutional offset places it principally under the contract claim below. In the alternative, if Defendant's native records classify all or any part of the movement as a member-initiated electronic transfer through online banking or another electronic channel, Plaintiff alleges that electronic transfer was unauthorized. The fraud alerts and external-account-linking event are alleged as evidence

bearing on account access and investigation, not as electronic fund transfers by themselves.

41. For each challenged electronic transfer, Defendant controls the native transaction, authentication, device, session, external-linking, fraud, and investigation records needed to determine authorization. Evidence that a familiar IP address, phone, device, credential, or session was involved may be relevant, but does not by itself establish that Plaintiff initiated or authorized a particular transfer.

42. Between December 31, 2025 and January 20, 2026, Plaintiff repeatedly requested written clarification concerning the closure status, post-closure activity, disputed transfers, and Regulation E determination. Defendant repeatedly directed him to communicate by telephone instead of providing complete written factual answers.

43. Plaintiff repeatedly requested the investigation, notice, account-status, transaction-audit, fraud, authentication, call, portal, and consumer-reporting records needed to test Defendant's explanations. Defendant has not produced a complete native record reconciling the August notice, October debit, December closure, later account activity, and January requests.

44. Plaintiff filed NCUA Consumer Assistance Center Case No. 00271572. NCUA issued a determination dated July 29, 2026. Plaintiff mailed an administrative appeal on August 12, 2026. The NCUA process does not

provide a substitute for the private civil remedy asserted here, and Plaintiff does not allege that it suspended EFTA's limitations period.

45. A version of Defendant's account agreement produced in 2026 contains an arbitration provision allowing either party to elect arbitration and requiring a written demand and a minimum 60-day pre-arbitration resolution period. Plaintiff is separately providing a written contractual demand. The version in force, delivery, and assent are matters for proof. Plaintiff reserves all challenges concerning notice, assent, retroactive application, enforceability, scope, waiver, and forum, including the applicability or enforceability of any forum-selection provision first produced by Defendant in 2026.

## V. FIRST CLAIM FOR RELIEF

### Violation of EFTA and Regulation E - Error Resolution and Required Notices

### 15 U.S.C. §§ 1693f and 1693m; 12 C.F.R. §§ 1005.11(a) and (c)-(e)

46. Plaintiff incorporates paragraphs 1 through 45.

47. The July 22 ATM withdrawal was an electronic fund transfer. Plaintiff's report that the ATM dispensed no cash after the debit alleged an error under 15 U.S.C. § 1693f(f)(5) and 12 C.F.R. § 1005.11(a)(1)(v), and his timely notice triggered the applicable error-resolution procedures.

48. Under 12 C.F.R. § 1005.11(c)(1) and (c)(2)(iv), the institution must report its results within three business days after completing its investigation. When it determines that no error occurred, 12 C.F.R. § 1005.11(d)(1) also requires a written explanation of findings, notice of the consumer's right to request the

documents relied upon, and prompt production of those documents upon request.

49. When an institution debits provisional credit, 12 C.F.R. § 1005.11(d)(2) requires notice of the date and amount of the debit and notice that the institution will honor certain qualifying instruments and preauthorized transfers for five business days, subject to the regulation's terms.

50. Plaintiff's nonreceipt of any August 21 determination, Becca's description of the materials sent around August 26 as the final outcome, and Defendant's later production of a separately dated August 21 document support a reasonable inference that Defendant did not timely transmit the complete written explanation and notices it now claims to have provided. Whether Defendant timely transmitted a compliant notice is a fact to be tested against Defendant's native transmission, mailing, portal, and document-history records. Plaintiff does not allege that August 26 was untimely merely because it was three business days after August 21, or that failure to read an otherwise properly transmitted notice would itself establish liability; he alleges nonreceipt, conflicting transmission accounts, and deficient notice content.

51. Defendant failed to comply fully with those duties in connection with the August 21 and October 20, 2025 debits. The August 21 document omits the debit date and the five-business-day protection. As to October 20, Defendant's later account describes at most a telephone notice of the date and amount and does not state that the five-business-day protection was given. On the

information available to Plaintiff, Defendant also failed timely to transmit all required written findings. The September 17 re-credit is alleged as evidence that the dispute remained open or was revisited, not as a separate provisional-credit-debit notice violation.

52. To the extent Defendant treats the later dispute as a reasserted error, 12 C.F.R. § 1005.11(e) applies only where the institution previously fully complied with the error-resolution requirements. Plaintiff alleges Defendant cannot establish such full prior compliance.

53. Defendant's alleged violations materially contributed to loss of use of the disputed funds, the negative checking balance following the October 20 debit, ensuing account consequences, and related expenses, to the extent proven and recoverable. Plaintiff seeks only actual damages shown to have the required causal connection to a proven violation, in an amount to be established by the evidence.

## VI. SECOND CLAIM FOR RELIEF

### Protective Alternative Claim - Unauthorized Electronic Fund Transfer and Consumer Liability

### 15 U.S.C. §§ 1693f, 1693g, and 1693m; 12 C.F.R. §§ 1005.6 and 1005.11; Fed. R. Civ. P. 8(d)(2)-(3)

54. Plaintiff incorporates paragraphs 1 through 53.

55. Plaintiff's August 24-25 written notice informed Defendant of circumstances indicating that unauthorized account access or transfers had occurred or might

occur and requested closure or protection. Under 12 C.F.R. § 1005.6(b)(5), notice may be given in any reasonable manner and may be constructively given when the institution becomes aware of circumstances leading to a reasonable belief that an unauthorized transfer has been or may be made.

56. Plaintiff did not initiate, approve, or authorize a member-directed $509.82 savings-to-checking movement. Defendant has classified the entry as an institution-initiated offset. On Defendant's stated classification, Plaintiff challenges the entry under the contract claim below rather than characterizing it as an unauthorized EFT.

57. This claim is pleaded in the alternative under Rule 8(d)(2)-(3). If Defendant's native records instead characterize all or any part of the $509.82 movement as a member-initiated electronic transfer through online banking or another electronic channel, Plaintiff alleges that transfer was unauthorized. The date, amount, source share 0001, destination share 0021, and competing classification give Defendant fair notice of the specific transaction at issue.

58. Plaintiff does not allege that a fraud alert or external-account-linking event is itself an electronic fund transfer. Those events are evidence bearing on access, authorization, and the adequacy of any investigation. Regulation E's official interpretation requires an institution to apply the error-resolution procedures to a properly asserted error even after the account has been closed.

59. For any qualifying EFT classification of the $509.82 movement, Defendant was required to investigate the asserted error, provide the notices required by

Regulation E, and impose consumer liability only as permitted by 15 U.S.C. § 1693g and 12 C.F.R. §§ 1005.6 and 1005.11.

60. Under 15 U.S.C. § 1693g(b), in an action involving consumer liability for an unauthorized electronic fund transfer, Defendant bears the burden to show that the transfer was authorized or to establish the statutory conditions for imposing liability. That burden applies to consumer liability for the challenged transfers; it does not convert every fraud warning or security event into an independently compensable transfer.

61. To the extent Defendant attributes the $509.82 movement to member-authenticated electronic instructions rather than its admitted offset decision, Plaintiff alleges on information and belief that Defendant failed to conduct or document a compliant investigation and has not produced the complete authentication and fraud-investigation record requested. A familiar IP address, phone, device, credential, or session may be evidence, but does not by itself resolve whether Plaintiff initiated or granted actual authority for the specified transfer. Plaintiff does not plead a free-standing EFTA claim merely because Defendant may have failed to use a particular security control.

62. Defendant's failures caused actual financial and consequential injury recoverable under EFTA, in amounts to be proven.

## VII. THIRD CLAIM FOR RELIEF

### Breach of Contract

### California Law

63. Plaintiff incorporates paragraphs 1 through 62.

64. The then-applicable membership and account agreement, Electronic Fund Transfers Agreement and Disclosure, account disclosures, and account records formed contracts governing Defendant's administration of Plaintiff's accounts and disputes. Plaintiff does not concede that the version produced in 2026 was the version delivered to or accepted by him before the events at issue.

65. Plaintiff performed or was excused from further performance and timely notified Defendant of the disputed ATM transaction, compromise concerns, and disputed later activity.

66. The Electronic Fund Transfers Agreement produced in 2026 states in Section 11 that Defendant will tell the member the results within three business days after completing an investigation and will send a written explanation if it decides there was no error. The Membership and Account Agreement distinguishes among a linked-account overdraft transfer under Section 14, a contractual offset or statutory lien under Section 21, and reimbursement for an item paid after termination under Section 29.

67. Defendant's June 10, 2026 response classified the $509.82 movement as a Section 21 offset. Section 21 permits offset only against an obligation "owed" to Defendant. Plaintiff alleges that the supposed obligation was generated by

the challenged provisional-credit reversal and disputes the underlying debt's validity and amount. To the extent Defendant additionally relies on a statutory lien, 12 C.F.R. § 701.39(d) requires an outstanding financial obligation that is due and payable and unsatisfied.

68. If the produced agreements governed the events, Defendant breached their express terms by failing to provide the promised error-resolution results and written explanation and by applying savings funds under Section 21 without establishing a valid obligation actually owed to Defendant. To the extent Defendant relies on its statutory lien, Plaintiff further alleges Defendant did not establish an outstanding financial obligation that was due, payable, and unsatisfied. The December 4 closure notice and Defendant's later inconsistent account-status explanation are alleged as factual context bearing on account administration and the asserted basis for the December 5 transaction, not as a standalone contractual promise. If a different agreement governed, Defendant must identify that agreement and the provisions on which it relies. These alternatives are pleaded under Rule 8(d)(2)-(3).

69. Plaintiff suffered resulting damages in an amount to be proven. This claim is pleaded as an individual alternative claim and is subject to all preserved positions concerning arbitration and forum.

## VIII. PRAYER FOR RELIEF

1. Actual damages under 15 U.S.C. § 1693m(a)(1), in an amount to be proven;

2. Statutory damages under 15 U.S.C. § 1693m(a)(2)(A), in an amount not less than $100 and not greater than $1,000 as the Court determines;
3. Actual or contract damages measured by amounts proven to have been wrongfully debited, transferred, offset, retained, or applied, including the disputed $504.95 ATM amount and the alleged $509.82 post-closure offset, without duplicative recovery;
4. A declaration under 28 U.S.C. §§ 2201-2202, to the extent a live controversy remains, concerning the parties' respective rights and obligations under applicable law and contract, including the legal effect of the December 4 notice; the status of checking, savings, membership, and account access after that notice; and the legal basis, if any, for each challenged post-December 4 debit, transfer, offset, fee, or account entry;
5. An accounting or transaction-by-transaction reconciliation of challenged post-December 4 activity, to the extent legally available, identifying each entry's date, amount, source, destination, channel, initiator, asserted authorization, contractual or legal basis, and effect on the claimed balance;
6. Restoration, reimbursement, restitution, corrective credit, or damages, as legally available, for each amount proven unauthorized, wrongfully debited, contractually unsupported, or caused by a proven violation, without treating all gross post-closure deposits and withdrawals as automatically recoverable and without double recovery;

7. Correction of any account balance, fee, offset, account-status, or consumer-reporting consequence caused by the proven violations, to the extent the Court has authority to order such relief;
8. Prejudgment and postjudgment interest as allowed by law;
9. Costs of the action and, if counsel appears, reasonable attorney's fees as authorized by 15 U.S.C. § 1693m(a)(3);
10. Any further relief the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff demands a jury trial on all issues triable by jury.

Dated: August 21, 2026

Respectfully submitted,

__________________________________

Adam J. Fitch, Plaintiff, Pro Se
364 Shady Glen Dr.
Fallbrook, CA 92028
Telephone: 760-675-2999
Email: local12cat86@gmail.com